JOHN I. HAAS, INC. *v.* AMERICAN EXPORT
LINES, INC., ET AL.

[No. 73, September Term, 1964.]

74

*Decided December 7, 1964.*

The cause was argued before HENDERSON, C. J., and HAM-
MOND, HORNEY, SYBERT and OPPENHEIMER, JJ.

*John H. Skeen, Jr.,* with whom were *William A. Skeen;
Skeen, Wilson & Coughlin,* and *Derby, Cook, Quinby &
Tweedt,* on the brief, for appellant.

*Robert O. Smith, Jr.* for the Baltimore & Ohio Railroad
Company, one of the appellees.

*Harrison M. Robertson, Jr.,* with whom were *Brune, Rob-
ertson & Iglehart* on the brief, for Superintendence Co., Inc.,
part of appellees.

*Southgate L. Morison* and *Ober, Williams & Grimes* on the
brief for American Export Lines, Inc., other appellee.

HAMMOND, J., delivered the opinion of the Court.

Suit was brought below by the importer of one hundred
sixty-four bales of Styrian hops it had sold to breweries against
the steamship company that brought the hops to Baltimore, the
Baltimore and Ohio Railroad Co., which acted both as operator
of the pier at which the hops were unloaded and as the initial
rail carrier, and Superintendence Co., Inc., which sampled and
weighed the bales at the pier, for the value of forty-seven of
the bales which, at the end of a rail journey at San Francisco,
were found on inspection to have become contaminated by oil,
grease and moisture and were rejected in part as to twenty
bales and in whole as to twenty-seven bales by the brewery
there to whom they had been consigned.

The case was heard by the court sitting without a jury, and
the significant facts were presented almost entirely by deposi-

tions. The court found that the bales were delivered in good condition by the steamship company and that the importer had not proven that the oil, grease or moisture had been caused by the Superintendence Company. Judge Carter held that the railroad was not liable either as warehouseman—where it "is held to the duty of care with which a reasonable man would treat his own possessions"—or as a common carrier—where it "is held to be an insurer of the goods, and his liability can be rebutted only by a showing of inherent vice or an act of God, etc." He found as facts that the "predominant damage" to the hops was mold; the mold was caused by moisture; to prevent sweating and hence mold, hops are customarily stored or kept in cool or freezing temperature; the hops were transported from Baltimore to San Francisco in an unrefrigerated car, no request having been made for a refrigerated car, and because the hops were not refrigerated during transit they sweated and the sweating caused the damage.

There was testimony from which the trier of fact properly could have found, as he did, that there was no oil, grease or moisture on or in the bales as a result of their handling by the Superintendence Company or by the railroad as warehouseman. This included the following facts: (a) all of the one hundred sixty-four bales received the same handling at the same pier before they were delivered to a carrier and none was damaged but the forty-seven bales which were shipped to San Francisco (forty-one bales were sent in one lot to a Milwaukee brewery by motor carrier, as were twenty-seven other bales to a Baltimore brewery by another truck line, and all were undamaged and accepted by the brewery) ; (b) another lot of forty-nine bales were sent by rail to Los Angeles, delivered undamaged and accepted by the consignee brewery there; and (c) the freight waybill for the Los Angeles shipment bore the notation "all covers dirty" as did the waybill covering the San Francisco shipment here involved, and the testimony was that if the bales had shown signs of oil or grease or moisture, the notation would not have been "dirty" since this connoted only ordinary dirt resulting from customary handling. *Cf. Adams Express Co. v. White*, 132 Md. 626, 629.

We think, however, (a) that the evidence before the trial

judge did not permit the finding he made as to the cause of the damage to the hops that were shipped to San Francisco, and that therefore his finding was clearly erroneous, and (b) that although the controlling law as to the liability of the railroad as a common carrier was correctly stated, it was not correctly applied.

Where a plaintiff proves that goods were delivered to a carrier in good condition and were in bad condition upon arrival at destination, a presumption arises that the damage occurred through the fault or negligence of the carrier, and this casts upon the carrier the burden of going forward and showing either that the goods were not in good condition when delivered to the carrier or that the damage was occasioned by some cause which excepts the carrier from absolute liability, such as inherent vice or infirmity of the goods or act of God.[1] Accordingly, the mere proof of delivery of the goods to the carrier in good condition and of their arrival at the place of destination in damaged condition makes out a prima facie case against the carrier, so that if no satisfactory explanation is given as to how the damage occurred, the carrier may be held liable. See 14 Am. Jur. 2d *Carriers,* Sec. 620, p. 134; *Galveston, H. & S. A. R. Co. v. Wallace,* 223 U. S. 481, 56 L. Ed. 516; *P., B. & W. R. Co. v. Diffendal,* 109 Md. 494; *Penna. R. R. Co. v. Walker,* 147 Md. 323; *Ledoux v. Railway Express Agency* (Vt.), 35 A. 2d 665; and *Richards Mach. Co. v. McNamara Motor Express, Inc.* (Wis.), 97 N. W. 2d 396. *Cf. Chesapeake & O. R. Co. v. Thompson Mfg. Co.,* 270 U. S. 416, 70 L. Ed. 659.

The evidence in the present case showed that the railroad as a carrier received the forty-seven bales of hops consigned to San Francisco in good condition and that they arrived at destination damaged from penetration of oil, grease and moisture. The

---

1. Formerly the rule was that if more than one carrier took part in the carriage and the goods had been originally delivered in good condition, the delivering carrier was presumed to be at fault if they were delivered to the consignee in bad condition, and it was the one to be sued by the shipper, but since the passage of the Carmack Amendment the initial carrier may in such case be sued and held liable. Galveston, H. & S. A. R. Co. v. Wallace, 223 U. S. 481, 56 L. Ed. 516.

brewery to whom the shipment was consigned was persuaded to accept twenty of the least damaged bales upon being granted an allowance for the damaged portions of the hops, but it refused to accept the remaining bales after it had sampled each one and found the damage so extensive as to make the hops therein unusable.

The testimony in the depositions of the brewmaster and assistant brewmaster of the consignee brewery and of an experienced cargo surveyor was that upon examination at San Francisco the burlap wrappings of the bales were stained with oil, with grease, with bird droppings and with colorless moisture spots and yellow stains apparently caused by some liquid. They agreed that the colorless spots and the yellow spots were still moist when they examined the bales and that the moisture had penetrated into the hops from the outside. There was no evidence of moisture damage or of mold except under the spots, and most of it was under the yellow spots. The brewmaster's testimony was that moisture did more damage than oil or grease, although both of the latter two caused extensive harm and often there were both kinds of damage to the hops in the same bale.

The railroad offered no testimony to explain how the oil, grease and moisture got into the bales or to show that it was not responsible for their presence. The forty-seven bales were loaded on November 25, 1961, from the pier in Baltimore into car number SO 272429. On November 28 a car inspector at the Locust Point yards of the railroad, not far from the pier, found a defect in that car and ordered it transferred to the repair track. There, the car department found it could not be repaired with the load in it and it was sent back to the pier, where the forty-seven bales were removed and reloaded into car number GN 12517, in which they travelled to San Francisco, arriving there on December 12. No witness was produced by the railroad to show the condition of the first car or the circumstances of the handling of the bales while in it or while they were in the process of being transferred to the second car.

To escape liability, the railroad relied below and relies here on the statements of the brewmasters that their brewery stored hops for several years, and during that time kept them under

refrigeration to maintain their flavor and aroma and to prevent their sweating, which compressed hops have a tendency to do. Some breweries, it was said, keep the temperature at freezing, others at 42° to 45°.

We think this testimony does not fairly lend itself to a finding that internal sweating from lack of refrigeration caused the damage to the hops, or even that the predominant damage was from moisture. The cargo surveyor testified without controversion that at the time of the year when the hops were transported —November 25 to December 12—no refrigeration would have been needed (and this would seem to coincide with common experience and knowledge of mankind). The testimony of the brewmasters and the cargo surveyor all but demonstrated that two kinds of moisture had descended onto the outside of the bales and that the resulting dampness penetrated within and caused the moisture damage and mold, and that such damage was not caused by internal sweating. The railroad offered no testimony that the cargo surveyor was wrong in his view that no refrigeration was needed in the late fall or early winter period of the transportation, either that the fact was to the contrary or as to unusual warm weather anywhere along the northern route from November 25 to December 12, or of heat in the car, or otherwise. Further, the testimony showed that almost as much damage occurred from oil and grease as from moisture and often the two kinds of damage overlapped. See *Chesapeake & O. Ry. Co. v. Timberlake, Currie & Co.* (Va.), 137 S. E. 507; and *Akerly v. Railway Exp. Agency* (N. H.), 77 A. 2d 856.

Since the railroad did not meet its burden of showing it was not responsible for the harm to the hops which occurred while they were in carriage, and there is no real controversy as to the amount of the loss suffered by the importer, *cf. Penn. R. Co. v. Orem Fruit Co.,* 111 Md. 356, and *Feldman v. Transportation Co.,* 144 Md. 209, 212, judgment will be entered for it against the railroad. The testimony was that the aggregate of the cost of reconditioning the twenty bales which the brewery accepted and the loss of the bad hops in these bales was $299.80 ($130.26 for labor and $169.54 for destroyed hops). The rejected twenty-seven bales contained hops of a net weight of

15,075 pounds. The brewery had agreed to pay $0.93408 per pound, or a total of $14,081.25. The extensively damaged hops were sold for $4,221.00, leaving the claimant-importer with a net loss of $9,860.25. Adding the $299.80 makes $10,160.05, for which judgment will be entered as of July 15, 1963, the date of the entry of the erroneous judgment below.

> *Judgment in favor of Baltimore and Ohio Railroad Company reversed; judgment in favor of American Export Lines, Inc. and Superintendence Co., Inc., affirmed; judgment as of July 15, 1963, entered in this Court in favor of John I. Haas, Inc., against the Baltimore and Ohio Railroad Company for $10,160.05, costs in this Court to be paid by the Baltimore and Ohio Railroad Company.*